IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 11, 2017 Session

## ANDREW HAYES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-03864     Paula Skahan, Judge**

_____

**No. W2016-00280-CCA-R3-PC**
_____

The Petitioner, Andrew Hayes, appeals the denial of his petition for post-conviction relief from his first degree felony murder and aggravated robbery convictions, arguing that the post-conviction court erred in finding he received effective assistance of trial counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

James Jones, Jr., Bartlett, Tennessee, for the appellant, Andrew Hayes.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The Petitioner was convicted by a Shelby County Criminal Court jury of the August 2007 first degree felony murder and aggravated robbery of the victim, Danny Harris. His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. State v. Andrew Hayes, No. W2010-02641-CCA-R3-CD, 2012 WL 3192827, at *1 (Tenn. Crim. App. Aug. 6, 2012), perm. app. denied (Tenn. Nov. 28, 2012).

Our direct appeal opinion reveals that the victim's decomposing body was discovered in his Memphis apartment on October 26, 2007. Id. at *3. The medical examiner ruled that the cause of death was "[b]lunt force injuries of the head and asphyxia," and a computer analysis of the victim's pacemaker indicated that "all heart activity had ceased on August 20, 2007." Id. at *7. The Petitioner was developed as a suspect after his girlfriend's mother, Janice Jefferson, who was known as "Snow,"[1] reported to the police that the victim's girlfriend had been selling the victim's possessions. Id. at *2. At the time, the Petitioner lived in Snow's home with Snow and her daughter, Chawonna Jefferson, who was the Petitioner's girlfriend. A short while earlier, the home had also been occupied by the following individuals: the victim's girlfriend, Tammy Vance; Ms. Vance's daughter, Sarah Lucas; and Ms. Lucas's boyfriend, Miguel. When Ms. Vance moved into the home toward the end of August 2007, she had a black eye and a scratch on her face. Ms. Vance informed Snow that the victim "had hit her in the eye because he was drinking" and that he had, as a consequence, recently entered "rehab." Id. at *1.

During the time they lived in the home, Ms. Vance and her daughter were driving "a real nice truck." According to Snow's trial testimony, the two women informed her that the vehicle belonged to the victim, who had given them permission to drive it while he was in rehab. Id. Snow eventually asked the trio to move out because they were not paying their portion of the utility bill. Id. According to Snow, Ms. Vance offered her a handgun as payment and also brought her a television that she claimed she had been given by a woman who lived around the corner. Id. Later, Ms. Vance sought Snow's assistance in selling the handgun and the victim's truck, telling Snow that the victim was going to be in rehab longer than initially planned and had instructed her to sell the items. Id.

The Petitioner, who was not initially a suspect, was interviewed by police detectives because they believed he "had relevant information" due to his involvement with Ms. Vance and her daughter. Id. at *4. Our direct appeal opinion provides the following summary of the detectives' trial testimony with respect to those interviews:

> During that first interview, the [Petitioner's] "story kept changing and changing and changing." Lieutenant [Bart] Ragland [of the Memphis Police Department] said that at that point, "it became obvious . . . that he knew more than he was telling . . . and that he had more involvement than just being a witness," so they provided the [Petitioner] with Miranda warnings. The [Petitioner] had some difficulty reading the advice of rights

---

[1] In order to avoid confusion, we have elected to follow the direct appeal opinion's practice of referring to Ms. Janice Jefferson by her nickname, "Snow."

form, so Lieutenant Ragland "read the entire thing to him and he understood it and we went over it." The [Petitioner] executed a written waiver of his rights at 3:15 p.m. on November 2, 2007, and he provided a statement at 5:57 p.m. that same day implicating Ms. Vance in the victim's murder, telling officers that he traveled with Ms. Vance and Ms. Lucas's boyfriend, Miguel, to an apartment in Cordova to get a 36 inch television. The [Petitioner] told officers that he opened a closed bedroom door inside the apartment because he "smelled the foul odor" and that he saw the victim's "body laying in the bed." He said Ms. Vance told him "not to worry" about the body because she and Miguel "were going to take care of it." The [Petitioner] described the body as "a white male, he was laying on his left side. He was about in his mid-fifties. He was medium build. His skin was turning black. His hair was brown, and he had a mustache, too." He said that he did not notice anything in the victim's mouth or any blood in the room. He said that he and Miguel loaded the television into the victim's truck and that Ms. Vance also removed "a VCR and a DVD player that was built together and DVD movies." He said that they left the victim's apartment and traveled back to the Depass Street residence to pick up Ms. Lucas so that Ms. Lucas could pawn the items. The [Petitioner] told Lieutenant Ragland that he did not tell anyone about seeing the corpse in the apartment because he was afraid that he would be charged with the victim's murder because he had helped move the television.

Lieutenant Ragland said the fact that the [Petitioner] was able to describe the victim as a white male was suspicious because "the state of decomposition of the victim at the time" made it difficult "to tell that was indeed a male white." Lieutenant Ragland said that he spoke with the [Petitioner] on a second occasion and that the [Petitioner] "gave a statement, but he stopped. . . . And he refused to sign the statement." Between the giving of the two statements, Lieutenant Mullins "interviewed" the [Petitioner], and "it became apparent that he had more involvement" than he had originally admitted. During the taking of the second statement, the [Petitioner] initially "admitted that he had actually been involved and hit the victim with a steel pipe" before he "recanted and said that, no, he didn't actually do it." Following this recantation, the [Petitioner] "became hysterical and started crying, and at that point, it became obvious [that officers] couldn't talk to him anymore." Shortly thereafter, the [Petitioner] was booked into the jail "on a forty-eight hour hold."

Lieutenant Ragland said that he became suspicious of the [Petitioner] when the details of the [Petitioner's] statement changed over tellings. Lieutenant Ragland admitted that he was not present when the [Petitioner] first admitted striking the victim with a pipe. He said that after recanting his admission of murder, the [Petitioner] blamed the victim's murder on Wayne Bobo, Snow, and Ms. Jefferson. He said that the [Petitioner] became "hysterical" and that it was impossible to continue the interrogation. Lieutenant Ragland denied that the [Petitioner] was upset at being accused of a crime he did not commit and said that the [Petitioner] was upset "[b]ecause he had admitted to his involvement and he knew he was up shit creek without a paddle, that's why." He said that the [Petitioner] immediately began recanting and blaming others "because that's what criminals do."

[Memphis Police Department] Sergeant Anthony Mullins testified that he became involved in the investigation when he arrived at the scene. Later, Sergeant Mullins interviewed the [Petitioner] after the [Petitioner] was "developed as a possible suspect." He recalled that when he first came into contact with the [Petitioner], the [Petitioner] was in Lieutenant Toney Armstrong's office. During that encounter, the [Petitioner] "could describe things in the apartment and describe things that happened and the more we asked him about what happened, he gave particular details that no one would know[ ] unless they committed the act." Sergeant Mullins said that upon further questioning, the [Petitioner] admitted killing the victim, telling officers,

> They went there, him and Tammy Vance, to rob [the victim], and when they got inside an argument ensued. He wanted to know, [the victim] wanted to know why they were there, how they got in his apartment, because Miss Vance had a key. And during the argument, Tammy Vance threw a container of bleach at [the victim] and then he said he struck [the victim] in the head with an iron pipe, pushed him in the bedroom and struck him again, and again, and again. Ultimately, he said, between seven and nine time[s].

Sergeant Mullins said that the [Petitioner's] statement "explained some of the things" that police had seen in the victim's apartment, like the rag in the victim's mouth, which the [Petitioner] said Ms. Vance had "stuck . . . in [the victim's] mouth to stop him from screaming." Sergeant Mullins said that when they started to take a "formal" statement the second time, the

-4-

[Petitioner] "was getting some [details] wrong" such as the location of the victim's apartment. When Sergeant Mullins questioned the [Petitioner] about the mistakes, the [Petitioner] became "very upset" and said that "people have threatened him about this incident." The [Petitioner] then blamed Wayne Bobo and an individual named Miguel for the victim's murder but continued to acknowledge that he was present during the murder. During this time, the [Petitioner] was "[l]oudly crying and yelling." When it became apparent that they would be unable to obtain a statement from the [Petitioner], they took him "down to the jail on a hold" because they "felt like" they had sufficient proof "to charge him" but "weren't prepared to charge him at that point."

Sergeant Mullins testified that officers brought the [Petitioner] to the homicide office for another interview on the following morning. The [Petitioner] was provided <u>Miranda</u> warnings a second time. At that point, the [Petitioner] provided a statement admitting that he murdered the victim by striking him with a metal pipe "about seven or eight times on the head." He said that he went to the victim's apartment "[t]o rob him. Tammy said to ride with her to rob her boyfriend." The [Petitioner] admitted, "I struck him the first time with the pipe. She grabbed [the victim] by the mouth and shoved a face towel in his mouth." The [Petitioner] said that he did not get blood on him and that Ms. Vance threw the murder weapon into the Wolf River.

<u>Id.</u> at *4-6.

In his defense, the Petitioner presented the testimony of Dr. Randy Schnell, the Clinical Services Coordinator of the Memphis City Schools Mental Health Center, who "identified a psycho-educational evaluation performed on the [Petitioner] to determine the [Petitioner's] eligibility for special education services." <u>Id.</u> at *8. Dr. Schnell testified that the Petitioner's I.Q. in 1992, when the Petitioner was fourteen, was only 62, which "'was consistent with mental retardation.'" <u>Id.</u> He said it was extremely unlikely that the Petitioner's I.Q. score would have increased to normal levels by adulthood. <u>Id.</u>

The Petitioner, testifying in his own defense, denied any involvement in the murder and claimed that he made the incriminating statements because the police officers kept him in the interrogation room for hours, screamed at him, and told him that Ms. Vance had accused him of the murder. <u>Id.</u> at * 8-9.

The Petitioner also presented as a defense witness, Tammy Vance, who acknowledged that she had pled guilty to the first degree murder and aggravated robbery

-5-

of the victim, but denied that she had killed the victim and instead blamed the murder on her daughter, Ms. Lucas. Ms. Vance testified that she first met the Petitioner several days after the murder when she and Ms. Lucas returned to the victim's apartment to retrieve the victim's television set. She said she blamed the murder on the Petitioner when she was being questioned by the police because officers told her that the Petitioner had confessed and she was trying to protect Ms. Lucas. Id. at * 9-10.

On January 14, 2013, the Petitioner filed a pro se petition for post-conviction relief in which he alleged he was denied the effective assistance of trial counsel. Following the appointment of post-conviction counsel, he filed an amended petition in which he alleged that trial counsel was ineffective for, among other things: failing to have a mental health evaluation performed on the Petitioner, despite knowing of the Petitioner's history of mental health issues; failing to investigate and call as a trial witness a woman who could have testified that it was other individuals, and not the Petitioner, who removed items from the victim's residence; failing to strike a juror who was a work colleague of one of the victim's sons; and failing to test a bloody fingerprint found at the crime scene against the fingerprints of Sarah Lucas.

At the evidentiary hearing, Clark Chapman, the private investigator who was appointed to assist defense counsel, testified that he learned that the Petitioner had "numerous learning disabilities" and "nervous issues throughout his childhood and as an adult" and had been receiving disability benefits since the age of twelve or thirteen. Mr. Chapman identified the Petitioner's school mental health professional report, which he said he turned over to trial counsel approximately eight or nine months prior to trial. He testified he interviewed fifteen to twenty witnesses during the course of his investigation, including Frances Wheeler, the woman who owned the house where the Petitioner was living. He learned of her late in the case and interviewed her close to the time of trial. Ms. Wheeler informed him that she had gone to the Petitioner's home one morning because the Petitioner was supposed to help roof one of her rental properties. The Petitioner was still asleep when she arrived, and she instructed one of the other residents of the home to wake up the Petitioner. As she waited for the Petitioner, Tammy Vance and her daughter arrived in the victim's truck with a large screen television in the back of the truck. According to Ms. Wheeler, the Petitioner came out of the house and helped the women unload the television.

Mr. Chapman testified that he believed Ms. Wheeler's account coincided with the information he received from Ms. Tammy Vance, who confessed to him that it was her daughter, and not the Petitioner, who had killed the victim. He said he called trial counsel and informed him of what Ms. Wheeler had told him. He stated that trial counsel was not present during his interview with Ms. Wheeler and, to his knowledge, never interviewed Ms. Wheeler himself. He said that trial counsel was confident that the

case "would either settle before [they] went into trial or . . . would just go away" and did not think they needed "anything else."

On cross-examination, Mr. Chapman testified that he spoke with the Petitioner throughout his preparation of the case and that the Petitioner appeared to be engaged in the investigative process and to understand everything he said to him. He said he thought that Ms. Wheeler would have been an instrumental witness in "identifying who had the TV that morning" and, as such, would have corroborated Ms. Vance's story that her daughter had killed the victim with a hammer. He acknowledged, however, that trial counsel had cross-examined Ms. Vance about her contention that her daughter was the perpetrator.

On redirect, Mr. Chapman explained that Ms. Wheeler's testimony that the two women brought the television to the house alone was significant because the State's theory was that Ms. Vance had to have the Petitioner's help in loading the television. In addition to Ms. Wheeler, he also thought that the defense should have had a physician appointed to investigate the Petitioner's mental health issues. He stated that the defense team contacted a doctor to perform a mental health evaluation on the Petitioner, but the physician backed out, citing a conflict of interest. To his knowledge, no one else was ever appointed to take that physician's place.

On re-cross-examination, Mr. Chapman acknowledged that the Petitioner provided details in his statement to police that were consistent with the physical evidence at the crime scene. He further acknowledged that the Petitioner said during cross-examination that the prosecutor would not be able to make him say anything he did not want to say. He explained, however, that the Petitioner had felt comfortable at trial because he was in the presence of trial counsel. In his opinion, a mental health expert would have been able to testify to the Petitioner's overall capacity and how he could be easily pressured in stressful situations, such as while being interviewed by aggressive police officers.

Upon further direct examination, Mr. Chapman testified that the Petitioner did not always appear to follow everything that was said to him and at times did not "seem like he [was] there." He further testified that the Petitioner's school report indicated that his intellectual functioning was in the "mild range of mental retardation." He said the Petitioner was questioned for twelve to thirteen hours before he gave his statement to the police.

The Petitioner's trial counsel, who said he had been licensed to practice law since 1973 and had been in private practice, primarily criminal defense, since 1984, testified that the Petitioner's case was the only one of hundreds he had handled in which he believed that an innocent man had been incarcerated. He stated he met with the

Petitioner on "numerous occasions" during the course of his representation, and the Petitioner was very easy to talk to and appeared to understand the charges against him. The Petitioner could not, however, "process the technical side of it in terms of the law; in terms of evidence." According to trial counsel, the Petitioner's position was that he was not there and did not commit the crimes, and the Petitioner could not understand why he had been charged in the case.

Trial counsel testified that they discussed having a mental evaluation performed on the Petitioner and "made an effort to contact someone for that purpose." However, the "intervening development" of Ms. Vance's changing her story about the Petitioner's participation in the crimes "changed the course of [their] strategy in th[e] case." He explained that there was no physical evidence linking the Petitioner to the crimes and that the Petitioner became a suspect only after Ms. Vance implicated him in her statement to the police. When Ms. Vance confessed that she had been trying to protect her daughter, and agreed to testify to that effect at trial, the issue of the Petitioner's mental capacity became less important:

> Her agreement to come and testify for the defense in this case kind of changed the course of the strategy that we were originally planning. And [the Petitioner's] mental state, mental condition ability were not seen as important in light of that new development with Ms. Vance agreeing to come and testify.

Trial counsel testified that his original plan was to hire a "confession expert," but he did not follow through with that plan in light of Ms. Vance's agreement to testify that her daughter was the perpetrator. In hindsight, however, he thought he made a mistake in not hiring the confession expert, who would have been able to explain to the jury why the Petitioner would have confessed when he was not guilty. He stated that he extensively prepared the Petitioner to testify, spending much time reviewing with him the length of the police interrogation and what led to his statement to the police, but that a confession expert could have helped the case tremendously and that he erred by relying too heavily on Ms. Vance's testimony. In addition, trial counsel believed he erred by not instructing the Petitioner to remain calm and to refrain from becoming aggressive or argumentative with the prosecutor. Trial counsel testified that, given the Petitioner's limited mental capacity, he should have anticipated that the Petitioner would become upset in the face of aggressive questioning and "would explode . . . under strenuous cross-examination."

Trial counsel testified that he did not have the bloody fingerprints found at the crime scene tested because there was no evidence that the Petitioner was at the crime scene and no evidence that the fingerprints belonged to him. As for his failure to exercise a peremptory challenge to strike Juror Number 7, who was an employee of the sheriff's

department and a presumed co-worker of the victim's son, trial counsel testified that he could not recall his reasoning, but the juror's association with the sheriff's department would not have been an automatic basis for trial counsel to strike him. Counsel explained that he sometimes looked for jurors that he believed had "the ability to process evidence and facts and make an intelligent decision" and that he would not have automatically assumed bias on the part of a juror because he "was somehow affiliated with the sheriff['s] department."

On cross-examination, trial counsel testified that he never had any question about the Petitioner's competency to stand trial. He also acknowledged that he filed an unsuccessful motion to suppress the Petitioner's statement on the basis that the statement was coerced.

Frances Wheeler, the owner of the rental home in which the Petitioner had lived, testified that one morning she was at the property to work on the roof when Ms. Vance and her daughter pulled up in a white truck with a television in the back. The Petitioner, who was supposed to be helping her with the roofing, was asleep inside, but Ms. Vance's daughter went in and then stuck her head out to announce he would be out in a minute. On cross-examination, Ms. Wheeler testified that she was not sure of the date the events transpired.

The Petitioner testified that he was innocent and that he had had faith in trial counsel to prove his innocence. On cross-examination, the Petitioner acknowledged he had been a witness in another criminal case and that he understood his rights when the police interviewed him. He denied, however, that trial counsel prepared his trial testimony or kept him informed of the defense strategy in the case. On redirect examination, he testified that he was treated very differently by the police in the previous criminal case in which he had been merely a witness. He further testified that he only had an eighth grade education and that he spent his entire school career in resource classes.

On October 5, 2015, the post-conviction court entered a detailed written order denying the petition. On February 22, 2016, this court entered an order allowing the late-filing of the Petitioner's notice of appeal.

## ANALYSIS

The Petitioner argues on appeal that trial counsel was ineffective in his representation for not having a mental evaluation performed on the Petitioner, not calling Ms. Wheeler as an eyewitness to the fact that Snow and her daughter did not need the Petitioner's assistance to move the large television, not striking the work colleague of the

-9-

victim's son from the jury, and not testing the bloody fingerprint at the crime scene against the fingerprints of Sarah Lucas. The State argues that the record supports the post-conviction court's finding that the Petitioner received effective assistance of trial counsel. We agree with the State.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State , 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State , 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In finding that the Petitioner failed to meet his burden of demonstrating ineffective assistance of counsel, the post-conviction court, among other things, found that: trial counsel made a sound strategic decision not to pursue a mental health examination in light of Ms. Vance's change in testimony and the fact that there was no physical evidence linking the Petitioner to the crime scene; the Petitioner was not prejudiced by not having a mental evaluation; the untested bloody fingerprint did nothing to undermine the defense strategy of attempting to show that the Petitioner was not at the crime scene; the Petitioner failed to show that trial counsel was deficient for not striking the sheriff's department employee as a juror or that he was prejudiced as a result of counsel's failure to do so; and the Petitioner failed to show that he was prejudiced based on counsel's failure to call Ms. Wheeler as a witness.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel, a very experienced criminal defense attorney, offered a reasonable explanation for why he did not pursue a mental health evaluation of the Petitioner, explaining that there was nothing to link the Petitioner to the crime scene other than Ms. Vance's statement to the police. Ms. Vance, however, later confessed to him that she had implicated the Petitioner to protect her daughter, who was the real culprit, and she agreed to testify for the Petitioner at trial. Although trial counsel believed in hindsight that a confession expert would have helped explain why the Petitioner would confess to a crime he had not committed, he also testified that the Petitioner was mentally competent to stand trial and that he was able to elicit details for the jury about the lengthy interrogation and the Petitioner's emotional distress during questioning. As the post-conviction court noted, the Petitioner also cannot show he was prejudiced by trial counsel's failure to have a mental evaluation performed.

Trial counsel also offered a reasonable explanation for why he did not attempt to have the bloody fingerprint found at the crime scene tested against the fingerprints of Sarah Lucas and why he did not strike the sheriff's department employee from the jury. As for trial counsel's failure to call Ms. Wheeler as a witness, we agree with the post-

conviction court that her testimony would not have altered the outcome of the trial. All that Ms. Wheeler would have added to the case was that she had seen Ms. Vance and her daughter arrive in a truck alone with a large television in the back. She was unable to testify as to the date the events transpired or how the television got into the back of the truck. In sum, the Petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we conclude that the Petitioner has not met his burden of showing that he was denied the effective assistance of counsel. Accordingly, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE